IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02903-SKC-CYC

STEPHEN MARTINEZ,

     Plaintiff,

v.

JEREMIAH VELASQUEZ, *et al.*,

     Defendants.

---

**JOINT RESPONSE TO DEFENDANT ACTION STAFFING SOLUTIONS,
INC., NERVAIS, AND CHERY'S MOTIONS TO DISMISS [DOCS. 24, 25, & 28]**

---

Plaintiff Stephen Martinez, by and through his undersigned counsel, respectfully files this joint response opposing the partial motions to dismiss filed by Defendants Action Staffing (Doc. 24), Chery (Doc. 25), and Nervais (Doc. 28).

## INTRODUCTION

Stephen Martinez lost his right leg above the knee when doctors were forced to amputate due to the spread of flesh-eating bacteria, or necrotizing fasciitis. Doc. 1 at ¶ 1 (Complaint, hereinafter "¶ __"). Infection had spread from his diabetic foot into the leg and bone, rotting and killing tissue. For over a month, Mr. Martinez, who was incarcerated and dependent on staff, repeatedly declared medical emergencies (the most you can do in prison to request urgent care) seeking care for his alarming diabetic foot infection. Mr. Martinez suffered from diabetes with complications, and

Defendants knew he was at high risk for amputation if they did not promptly, properly ensure access to necessary care.

Defendants Chery and Nervais—both RN's responsible as gatekeepers to accessing emergency hospital care—saw Mr. Martinez multiple times and knew he had worsening, disturbing symptoms. As medical staff, they had the responsibility to ensure Mr. Martinez received proper medical care. They failed to take appropriate action in deliberate indifference to the known and obvious risks of amputation. By the time Mr. Martinez was finally sent to the hospital, it was too late, and doctors were forced to amputate his right leg above the knee, near the groin.

The Complaint thoroughly alleges detailed facts showing Defendants, including Chery and Nervais, "**knew"** and it was also "**obvious"** Mr. Martinez needed emergency and/or specialist care, including a "foul odor" coming from the large infected wound which was "growing", significant pus and blood, discoloration of black and green flesh indicating dead tissue, that it "looked and smelled bed," and other extremely "obvious" symptoms. ¶¶ 111-124, 152-171. Despite the "known and obvious" dangers to Mr. Martinez, including amputation, Defendants Chery and Nervais (along with CDOC Defendants who did not move to dismiss) failed to act to ensure he received necessary emergency and/or specialist care for this limb-threatening condition. ¶¶ 124, 171.

Defendants' failures were the result of Action Staffing's failed policies and training, as the Complaint alleges. ¶¶ 224-232. Action Staffing implemented policies

2

of failing to provide and instead "delaying" needed care, while failing to train staff on obviously needed topics such as referring someone like Mr. Martinez to necessary emergency and specialist care. *Id.*

Although other CDOC medical staff were also sued, those Defendants did not move to dismiss and answered the Complaint in light of the well-pled allegations. Doc. 16 (Answer by CDOC Defendants). However, Defendants Chery, Nervais, and Action Staffing moved for dismissal in three separate though largely similar motions under Rule 12(b)(6). Docs. 24, 25, 28. Defendants concede the risk harm suffered by Mr. Martinez was sufficiently serious to necessitate proper care. Docs. 24, 25, 28 (not disputing objective harm). Defendants raise several perfunctory arguments which should be rejected, failing to accept the allegations as true and ignoring myriad well-pled allegation sufficient to allege deliberate indifference.

First, improperly ignoring myriad allegations to the contrary, Defendants' main argument disputes whether they "knew" or had the subjective state of mind sufficient for deliberate indifference. Doc. 28 at 6-8; Doc 25 at 5-8. To the contrary, the Complaint thoroughly alleges they had both subjective knowledge yet ignored the risks, and that it was also "obvious," that Mr. Martinez's worsening, foul-smelling infection for a diabetic foot at risk of amputation needed emergency and specialist care. ¶¶ 111-124, 152-171; *e.g., Jarvis v. McLauglin*, No. 120CV02028CNSGPG, 2022 WL 4388399, at *8 (D. Colo. Sept. 22, 2022) (knowledge by drawing "all reasonable inferences" in plaintiff's favor); *see also Stanton v. Correct Care Sols.*, No. 3:18-CV-

3

00378, 2018 WL 3473969, at \*6 (M.D. Tenn. July 17, 2018) (denying dismissal where nurses provided some care but failed to recommend evaluation by outside provider for diabetic foot ulcers); *Schaub v. VonWald*, 638 F.3d 905, 915, 919 (8th Cir. 2011) (affirming district court's finding "that [plaintiff's] oozing sores and the smell of infection made his serious medical needs 'more than obvious' to a layperson").

Second, Defendants seem to suggest their failures can be excused by providing "some" medical treatment, *i.e.,* superficial care, however obviously inadequate it was to treat his limb-threatening condition—an argument contrary to established law which this Court should reject. *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001) (disagreeing that "some treatment," in that case performing a procedure and administering medication, means there can be no deliberate indifference); *Tanner v. Campbell*, No. 21-CV-02340-CMA-NRN, 2022 WL 344897, at \*10 (D. Colo. Feb. 4, 2022) ("some" medical care does not mean no deliberate indifference). Plaintiff alleges Defendants knew the minimal care was obviously insufficient, and knowingly failed to provide the care—or to ensure access as gatekeepers—for his diabetic foot infection that Mr. Martinez desperately needed. This states a plausible claim.

Third, Action Staffing argues it is off the hook for *Monell* liability, also failing to accept the allegations as true or draw inferences in Plaintiff's favor. The allegations support plausible inferences of both policies, as well as a lack of policies, of denying and delaying necessary care. *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1185 (10th Cir. 2020) (cite omitted) (lack of policies or protocols may evince deliberate

4

indifference for *Monell*). Plaintiff also plausibly alleges Action Staffing failed to train Defendants Chery and Nervais on how to properly assess a diabetic foot infection, or to ensure an incarcerated person like Mr. Martinez had access to necessary emergency or specialist care. *Est. of Burnett v. City of Colorado Springs*, 763 F. Supp. 3d 1281, 1294 (D. Colo. 2025) (denying summary judgment in part on failure to train, including lack of training on responses to medical distress).

This Court should reject Defendants' invitation to improperly dispute and ignore Mr. Martinez's allegations. Accepting the facts as alleged and drawing inferences in his favor, plausible claims are stated so the motions should be denied.

## FACTUAL ALLEGATIONS

**Mr. Martinez is a type 2 diabetic with a history of neuropathy and diabetic foot fractures.** ¶¶ 40-41. He has been diagnosed with Type 2 Diabetes since 1996, and has managed his diabetes with insulin. ¶ 39. His neuropathy and other symptoms put him at risk for diabetic foot complications, including risk of amputation from untreated infection, which Defendants were well-aware of. ¶¶ 42-43, 55. Mr. Martinez is in prison due to a wrongful conviction currently under review for exoneration, and is represented by the Korey Wise Innocence Project. ¶¶ 35-38. He has exemplary conduct in prison, and has always been dedicated to managing his health in prison including his diabetic care. ¶¶ 38-39. Before suffering this amputation and becoming disabled himself, Mr. Martinez worked as an Offender Care Aid ("OCA") in prison, helping care for elderly and disabled men in prison. ¶ 32.

**Defendants' had a duty to provide care.** Defendants Stephanie Nervais and Angeline Chery were employees of prison medical company Action Staffing Solutions, Inc. (Action Staffing). ¶ 18. Although private employees and a private corporation, they had duties to ensure proper, constitutional care was provided to Mr. Martinez. ¶¶ 2, 6, 18-19.

**Risk of amputation is top of mind for diabetic neuropathy and Mr. Martinez's health conditions.** Defendants knew that diabetic neuropathy involves serious risk of complications, including foot injury, infection and amputation if an infection is not treated promptly and properly. ¶¶ 45, 49. The risk of amputation as a complication of diabetes was known to Defendants as medical professionals, and is commonly known lay people in America. ¶¶ 49, 54. Risk of lower extremity amputation is one of the most obvious and well-known risks for a patient with diabetic neuropathy, like Mr. Martinez. ¶¶ 50, 54, 43, 55. Risk of amputation was an obvious, top-of-mind risk facing Mr. Martinez due to his health conditions. ¶ 56.

**Mr. Martinez began experiencing foot and leg symptoms in September-October, which Defendants knew from his chart.** On September 18, 2023, Mr. Martinez sent a kite to medical staff notifying them of concerning foot and leg symptoms he had begun experiencing – his right leg was swelling from the thigh to the foot to double and even triple the size of the left leg, and he was in pain. ¶¶ 57-58. As alleged in the Complaint, from September 18 through October 17, Mr. Martinez repeatedly requested care, including declaring emergencies, as his

6

condition worsened and he sought proper care. On September 19, October 11, and October 14, CDOC medical staff (CDOC Defendants who did not move to dismiss) noted Mr. Martinez's worsening condition, including infection, discoloration, pus and infection, protrusions, and other extremely alarming symptoms. ¶¶ 66-110.

**Defendant Nervais was deliberately indifferent to Mr. Martinez's limb-threatening emergency on October 17.** Mr. Martinez declared another medical emergency on October 17, 2023, in effort to obtain proper care for his foot. ¶ 111. Defendant Nervais knew how bad Mr. Martinez's condition was, and how it had worsened from September into October, from his medical history and verbal reports. ¶¶ 55, 113-114, 119. The black, raised infection on his foot had opened up, there was blood and greenish pus coming out of the infected foot, and increased pain, swelling, and other symptoms. ¶¶ 111-113. It was so bad he had a "hole in his foot" due to the open wound with blood and pus draining out. ¶ 112. Mr. Martinez was assessed in medical by Defendant Nervais. ¶ 113. She visibly observed his symptoms, Mr. Martinez told her hod bad it was, she knew it from his chart, and she saw how the dangerous infection was growing. ¶¶ 111-116.

While Defendant Nervais spoke with Defendant Velasquez (a CDOC provider) on the phone and reported Mr. Martinez's symptoms and medical history, she failed to insist that Velasquez or any other provider evaluate Mr. Martinez's wound or even physically assess him, which she knew was obviously necessary. ¶¶ 117, 120. Defendant Nervais knew Mr. Martinez's symptoms indicated serious risk for limb-

threatening infection necessitating urgent evaluation and care, and knew Mr. Martinez required immediate evaluation by a diabetic foot doctor or other qualified physician or to be sent to a hospital emergency room for such care and evaluation that could not be provided in prison. ¶ 119. Instead, in knowing and reckless disregard, Defendant Velasquez prescribed and Defendant Nervais administered an antibacterial medication and over the counter pain medication, which both Defendants knew was totally inadequate for proper treatment of Mr. Martinez's limb-threatening emergency. ¶¶ 121-122.

Defendant Nervais knew these actions and inactions would allow Mr. Martinez's infection to fester and worsen, improperly evaluated and treated, increasing the risk of amputation or other adverse outcome. ¶¶ 122-123. She knew that if he received immediate care from a diabetic foot doctor or other qualified provider, he would likely be hospitalized to receive IV antibiotics and aggressive wound care (debridement, unroofing, cleaning out and removing infected tissue). ¶ 123. She denied Mr. Martinez this care, the care his condition obviously required, in deliberate indifference to the known and obvious dangers facing Mr. Martinez, including limb-threatening amputation. ¶¶ 123-124.

**Defendant Nervais's continued deliberate indifference to Mr. Martinez's limb-threatening emergency and foul smelling, worsening infection on October 23 and October 24.** Mr. Martinez was seen again by Defendant Nervais on October 23 and 24, 2023. ¶¶ 152-160. In the interim, Mr.

8

Martinez had again declared medical emergencies and had suffered a hypoglycemic emergency, even more red flags that he needed obvious emergency and specialist care. ¶¶ 127-142. On October 23 and 24, Defendant Nervais again saw Mr. Martinez's worsening, alarming symptoms, which Mr. Martinez also told her, and that the infection had a foul odor and other tell-tale signs of amputation risk. ¶ 154-156. Despite knowing it was obviously inadequate to treat this serious infection, Defendant Nervais merely provided superficial wound dressing. *Id*. She failed to debride, unroof, or provide other basic wound care, and failed to insist or even request emergency medical or specialist care, which she knew was obviously needed for Mr. Martinez's limb-threatening condition. ¶¶ 157-160. Defendant Nervais acted knowingly and with deliberate indifference to the ongoing risk of amputation due to the failure to provide Mr. Martinez access to desperately needed emergency care. *Id*.

**Defendant Chery was deliberately indifferent to Mr. Martinez's limb-threatening emergency on October 25.** On October 25, Defendant Chery observed Mr. Martinez's condition and worsening symptoms which she knew about from his medical history. ¶¶ 161-171, 55. She knew Mr. Martinez suffered "excruciating discomfort" and observed signs of dangerous infection, including alarming discoloration under the skin indicating pus and the foul odor. ¶¶ 164-166. She knew that Mr. Martinez's wound had not been properly evaluated or treated, ¶ 167, and yet failed herself to properly treat the wound by merely changing the dressing and other superficial care, failing to debride, unroof, or otherwise ensure infected tissue

9

was removed and the foot properly cleaned, ¶ 170. She failed to insist or request that Mr. Martinez received emergency and/or specialist care, with treatment to follow, in deliberate indifference to known and obvious dangers facing Mr. Martinez including amputation. ¶ 171.

**Defendant Chery's continued deliberate indifference to Mr. Martinez's limb-threatening emergency on October 27.** On October 27, Defendant Chery again failed to take action in deliberate indifference, despite his worsening symptoms, the continued foul odor, swelling, discoloration, draining pus, and other tell-tale signs of amputation risk from infection. ¶¶ 186-87. Once again, Defendant Chery failed to refer Mr. Martinez for emergency care or otherwise ensure he received examination and treatment by a qualified provider. ¶ 188. She provided mere superficial wound care which she knew would not properly treat Mr. Maritnez's festering infection or address the serious risk of worsening infection and amputation she knew he faced. ¶ 189. In doing so, she acted with deliberate indifference to the serious risks of Mr. Martinez's deepening infection and eventual amputation. ¶ 190.

**Mr. Martinez's leg is amputated above the knee on November 2.** ¶¶ 205-223. On November 2, Mr. Martinez was finally hospitalized, but it was too late due to the ongoing deliberate indifference of Defendants. *Id.* His right leg was amputated above the knee. *Id.* Mr. Martinez suffered severe pain, emotion distress, physical injuries, disfigurement, loss of his right leg, and other injuries due to the failures of Defendants including Defendants Nervais and Chery. ¶ 223.

10

**Defendant Action Staffing's failures of policy and training.** Action Staffing had a duty to ensure its staff, including Defendants Nervais and Chery, met constitutional requirements for prison medical care. ¶ 18. Accepted as true and drawing inferences in Plaintiff's favor, the Complaint alleges Action Staffing implemented numerous failures of policy and training which caused this constitutional violation, including:

**(1)** a policy of failing to provide and instead delaying obviously needed emergency care;

**(2)** a policy of failing to require employees to ensure a patient receives examination by a qualified provider when obviously required as it was for Mr. Martinez;

**(3)** a policy of failing to train its nurses to call for an ambulance or arrange other emergency care or hospitalization for patients like Mr. Martinez where an internal provider is unable or unwilling to provide obviously needed emergency medical care;

**(4)** a policy of failing to require or train its nurses to appropriately assess diabetic foot conditions such as diabetic foot fractures and ulcers;

**(5)** a policy of failing to require or train its nurses to appropriately debride infections, resulting in worsening, life and limb threatening infections;

**(6)** a policy of failing to require or train its nurses to appropriately report symptoms to higher levels of care;

11

**(7)** a policy of failing to require or train its nurses to appropriately instruct patients with diabetic foot fractures and diabetic foot ulcers not to bear any weight on the affected foot. ¶¶ 225-232.

Defendants Nervais and Chery acted consistently with their training and supervision, and were not disciplined or found to have acted outside of company policy related to Mr. Martinez's failed and delayed medical care. *Id.*

## LEGAL STANDARD

Judging a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009); *Boulter v. Kerr-McGee Oil & Gas Onshore, LP*, No. 1:24-CV-01459-SKC-KAS, 2025 WL 841041, at *2 (D. Colo. Mar. 18, 2025) (denying dismissal and "[t]aking the well-pleaded factual allegations as true"); *Constantinescu v. Advanced Micro Devices, Inc.*, No. 1:24-CV-01902-SKC-SBP, 2025 WL 2662947, at *3 (D. Colo. Sept. 17, 2025) (denying dismissal taking allegations as true and "construing them in the light most favorable to Plaintiff" to find "plausible inference" supporting claim).

A claim is stated when allegations "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "There is a strong presumption against the dismissal of claims under this rule." *Blevins v. Reid*, No. 06-CV-00969-MSK-KMT, 2008 WL

12

2428941, at *3 (D. Colo. June 12, 2008) (cite omitted). Dismissal is "a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias*, 567 F.3d at 1178 (cites omitted). "Specific facts are not necessary;" allegations need only give "fair notice" and need not "include all facts necessary to carry the plaintiff's burden." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

## <u>ARGUMENT</u>

### I. PLAINTIFF STATES A PLAUSIBLE CLAIM AGAINST DEFENDANTS NERVAIS AND CHERY, SO THEIR MOTIONS SHOULD BE DENIED

The crux of the almost identical arguments by Defendants Nervais and Chery seems to be their dispute of the allegations, claiming they did not have "subjective" deliberate indifference. Doc. 25 at 6-7; Doc. 28 at 8-9. They also suggest that this is a case of mere accidental "misdiagnosis," and suggest that if some medical care was provided to Mr. Martinez, that absolves them of liability. Doc. 25 at 8-9; Doc. 28 at 9-10. These arguments should be rejected because they fail to accept the allegations as true or draw inferences in Plaintiff's favor—which thoroughly, repeatedly allege facts showing subjective deliberate indifference.

"A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). A claim for inadequate medical care includes both an objective and subjective component. *Id.* at 751. The

13

objective prong is met if the deprivation is "sufficiently serious." *Sealock*, 218 F.3d at 1209. Defendants concede that the objective prong is met. Doc. 24 at 6; Doc. 25 at 6; Doc. 28 at 7. Only the subjective prong is at issue, which is satisfied if defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Plaintiff satisfies it here.

The Tenth Circuit recognizes two ways of alleging deliberate indifference, both of which apply: (1) "a medical professional may fail to treat a serious medical condition properly," or (2) "a medical professional knows that [her] role" in a particular medical situation is "to serve as a gatekeeper for other medical personnel capable of treating the condition," and "[s]he delays or refuses to fulfill that gatekeeper role." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023); *Quintana v. Santa Fe Cty. Bd. of Commissioners*, 973 F.3d 1022, 1030 (10th Cir. 2020) (deliberate indifference where "obvious to any reasonable observer.").

### A. This Court Should Summarily Reject Defendants Chery and Nervais's Perfunctory Argument

As an initial matter, the Court should reject Defendants Nervais and Chery's cursory arguments, which primarily repeated boilerplate law while ignoring the well-

pled allegations. In a recent similar case against a private medical company and its staff working in CDOC, Judge Sweeney rejected a motion to dismiss where the arguments were similarly "perfunctory." *Est. of Esquivel by & through Montalvan v. Williams*, No. 1:24-CV-02213-CNS-TPO, 2025 WL 3687390, at \*14 (D. Colo. Dec. 19, 2025) (denying dismissal and rejecting perfunctory arguments). Arguments are underdeveloped when they do not "lend themselves to meaningful analysis." *Est. of Ward by & through Stamp v. Pueblo Cnty., Colorado*, No. 1:23-CV-00473-CNS-MDB, 2023 WL 4744928, at \*9 (D. Colo. July 25, 2023), and this Court should "not consider...issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004); *see Tele-Communications, Inc. v. Comm'r*, 104 F.3d 1229, 1234 (10th Cir. 1997) (finding an argument underdeveloped when "[o]nly the final three sentences in [the relevant] paragraph ma[d]e any argument whatsoever").

Here, as in *Estate of Esquivel*, *Estate of Ward*, and *Tele-Communications, Inc.*, Defendants Nervais and Chery offer only a few sentences to their undeveloped argument regarding liability under the subjective prong of the deliberate indifference analysis. Doc. 25 at 8-9; Doc. 28 at 10-11. The majority of the argument sections of their motions, which are virtually identical, recite deliberate indifference case law with no analysis. Doc. 25 at 4-8; Doc. 28 at 5-10. The analysis Defendants Nervais and Chery make only encompasses only two paragraphs at the end of their motions, where Defendants cite just one case to support their argument and make several

15

conclusory statements without any citation to authority. Doc. 25 at 8-9; Doc. 28 at 10-11.[1] The Court should reject Defendants Nervais and Chery's cursory arguments and deny the motions as these Courts have in similar cases.

## B. Plaintiff Plausibly Pled Deliberate Indifference Against Defendants Chery and Nervais

Defendants' motion should also be denied even this Court reaches their minimal substance. Violating the *Twombly/Iqbal* standard, the motions fail to accept and instead ignore and dispute allegations, while failing to draw inferences in Plaintiff's favor. Defendants incorrectly claim Mr. Martinez did not allege their "culpable" mental state of deliberate indifference. Doc. 25 at 8; Doc. 28 at 10. This is incorrect, because the Complaint repeatedly, thoroughly alleges that they "**knew"** Mr. Martinez's foul-smelling, worsening infection needed emergency care they were failing to provide, that the need for such care was "**obvious**," and that their failures knowingly would result in putting Mr. Martinez at serious risk of amputation. ¶¶ 111-124, 152-171.

Properly accepting the allegations as true, Defendants knew, as even a lay person would, that with a diabetic foot infection, a worsening and foul-smelling

---

[1] Defendants failed to adequately raise these arguments in the motion which should be considered waived and not considered in any reply. *See, e.g., Latham v. High Mesa Commc'ns*, No. 17-CV-02118-JLK-GPG, 2020 WL 1626976, at *2 (D. Colo. Feb. 7, 2020) (declining to consider "new argument" in summary judgment reply brief) (citing *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009) ("[T]he general rule in [the Tenth Circuit] is that a party waives issues and arguments raised for the first time in a reply brief ....")).

infection calls for emergency, higher level care. They knew the minimal action taken, such as superficial wound care, was inadequate, they both saw his worsening condition multiple times, knew his medical history, and failed to take action to ensure he received proper care.[2] *Schaub*, 638 F.3d 905 at 919 (affirming district court's finding "that [plaintiff's] oozing sores and the smell of infection made his serious medical needs 'more than obvious' to a layperson"); *Stanton,* 2018 WL 3473969, at *6 (denying dismissal where nurses knew of plaintiff's diabetes and signs of infection but continued to provide ineffective foot treatment).

Accepting the allegations as true and viewing them in the light most favorable to Plaintiff, a "plausible inference" of subjective deliberate indifference can be drawn at this juncture, necessitating denial of the motion. *See Constantinescu*, 2025 WL 2662947, at *3 ("plausible inference" to deny dismissal). The Complaint plausibly alleges Defendants (1) **knowingly** failed to treat Mr. Martinez's serious condition **properly**, *Sealock*, 218 F.3d at 1211, (2) that such failure and necessity to treat was also **obvious**, *Lucas*, 58 F.4th at 1137, that they also (3) **knowingly** failed to

---

[2] Defendants as RN's also had their own duties of care, and cannot skirt liability by claiming a provider or other medical staff, such as CDOC Defendant Velasquez, is responsible. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurse has "independent duty" of sufficient care and may not defer to higher-level provider where it will harm the patient); *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (quote omitted) ("[A] nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health...."; nurse has a professional duty to "take appropriate action" when a doctor's decisions are questionable, including contacting "supervisory personnel" within the institution to voice concerns) (citing nursing ethical code)).

properly perform their "gatekeeper" role to send or at least request emergency medical care for Mr. Martinez, *Sealock*, 218 F.3d at 1211.

The Court should also reject Defendants' suggestion of "misdiagnosis" or the argument that providing *some* care to Mr. Martinez means they are immune from liability. The Complaint does not allege misdiagnosis or inadvertence—it thoroughly alleges knowing deliberate indifference. And the argument that providing some minimal treatment means they cannot be sued fares no better under Tenth Circuit law. In *Sealock*, the Court articulated the first form of deliberate indifference as a failure to treat a condition "**properly**."[3] 218 F.3d at 1211 (emphasis added). And in *Oxendine,* the Court disagreed that providing "at least some treatment," in that case performing a procedure and administering medication, means there can be no deliberate indifference. 241 F.3d at 1278 n.7; *see Tanner v. Campbell*, No. 21-CV-02340-CMA-NRN, 2022 WL 344897, at *10 (D. Colo. Feb. 4, 2022) (if "*some* medical care, no matter how inadequate," met constitutional muster, then "then no civil rights

---

[3] Abundant precedent supports this conclusion. *See e.g., Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006); *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (care must be adequate "in light of the severity of the condition and professional norms"; "some medical care does not automatically defeat a claim of deliberate indifference."); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (providing "*some* treatment" does not necessarily mean "*constitutionally adequate* treatment" (emphasis in original)); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("inadequate care [can] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment."); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (provider cannot continue with "course of treatment that he knows is ineffective in treating the inmate's condition.").

complaint where a medical professional provided any response to a sick person would ever survive a motion to dismiss. That is not the law.").

Here, this is not a misdiagnosis case, and it is not a case where medical staff made best efforts to treat a patient. Accepting the allegations as true, it's a case where Defendants knowingly, repeatedly ignored glaring signs of a serious, limb-threatening infection, which worsened over multiple medical visits, calling for emergency care—and failed to take action they knew should be taken. As contemplated by cases like *Oxendine,* the allegations support a plausible inference that Defendants knew (as was obvious) that the minimal care provided—inadequate medication and superficial wound care—was obviously inadequate to treat Mr. Martinez's properly and prevent risk of amputation. 241 F.3d at 1278 n.7; *Tanner*, 2022 WL 344897, at *10.

Properly drawing inferences in Plaintiff's favor, the Complaint alleges plausible inferences of deliberate indifference, so the motions should be denied.

## II. PLAINTIFF STATES A PLAUSIBLE *MONELL* CLAIM AT THIS PRE-DISCOVERY JUNCTURE

To state a *Monell* claim, Plaintiff must allege: (1) the existence of a policy, practice, or custom, and (2) a direct causal link between the policy, practice, or custom and the injury alleged. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978). A policy or custom can be alleged in many ways, including:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (citation and quotations omitted). As one Court put it, plaintiffs need allege only "minimal elaboration" of a *Monell* claim to survive dismissal, such as allegations of "training inadequacy," a "challenged policy" or practice, "or any other minimal elaboration a plaintiff can provide." *Arakji v. Hess*, No. 15-cv-00681-CMA, 2015 WL 7755975, at *6 (D. Colo. Dec. 2, 2015) (quote omitted). Plaintiff pleads a *Monell* claim against Action Staffing, a "private entit[y] acting under color of state law" by contracting to provide prison medical care, *Lucas*, 58 F.4th at 1144. Action Staffing does not contest their potential liability under *Monell*, Doc. 24 at 5.

Action Staffing's motion fails for several reasons, and fails to accept the allegations as true as required at this juncture. Action Staffing incorrectly claims Plaintiff (1) did not allege a formal Action Staffing policy that was a moving force in the violation, ignoring allegations (*see* ¶¶ 225-232), (2) incorrectly claims unconstitutional practice or custom is not pled, ignoring additional allegations (*see* ¶¶ 111-124, 152-171, 186-190, 225-232), and (3) incorrectly claims Plaintiff has

"fail[ed] to allege sufficient facts to plausibly show" failure to train—when the Complaint is actually more detailed than is required in alleging specific training failures (*see* ¶¶ 225-232). The motion should be denied.[4]

### A. Plaintiff Alleges Action Staffing's Policies Caused The Harm

Action Staffing's motion improperly ignores clear allegations they implemented policies of denying and delaying necessary care. ¶ 225. Plaintiff need not quote or identify a particular policy at this pre-discovery stage—that kind of information, particularly for a private company, can typically only be obtained through discovery. *Walker v. Zepeda*, No. 111-CV-01242-DME-CBS, 2012 WL 13285403, at *5 (D. Colo. May 29, 2012) (Ebel, Circuit Judge) (plaintiff not expected to have detailed policy information at pleading stage); *Est. of Blodgett v. Correct Care Sols.*, LLC, No. 17-CV-2690-WJM-NRN, 2018 WL 6528109, at *6 (D. Colo. Dec. 12, 2018) (considering the impact of an asymmetry of information upon the pleading in the context of a motion to dismiss).[5]

---

[4] Action Staffing does not raise issue with any other aspects of Plaintiff's *Monell* claim, including causation, waiving any argument at this stage. *See, e.g., Latham v. High Mesa Commc'ns*, 2020 WL 1626976, at *2; *M.D. Mark, Inc.*, 565 F.3d at 768 n.7.
[5] Action Staffing confusingly raises that Plaintiff has "failed to allege any facts that Defendant failed to supervise care separate and apart from similar boilerplate allegations", Doc. 24 at 14, and then cites Complaint ¶¶ 212 and 303. Plaintiff does not allege a failure to supervise theory of *Monell* at ¶ 212 and there is no ¶ 303 in Plaintiff's Complaint (the last numbered ¶ is ¶ 271). Any such argument should be considered waived by Action Staffing as not adequately briefed.

The inference Defendants Nervais and Chery acted pursuant to Action Staffing policy is also plausibly supported given the company did not discipline or take any action to correct Defendants' failures. *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989) ("Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right."); *McRorie v. Shimoda,* 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after [constitutional violations], ... officials took no steps to reprimand or discharge the [subordinates], or if they otherwise failed to admit the [subordinates'] conduct was in error.").

## B. Action Staffing's Policies Failing to Require Care Caused Harm

A *Monell* claim is also alleges for a failure of policy to require necessary action to ensure constitutional care. Action Staffing misunderstands the claim and the law in this regard. Plaintiff alleges Action Staffing's policies also failed to implement protocols or require its employees to provide essential care in this scenario, *i.e.,* (1) physical examination by a provider when obviously needed, (2) appropriate diabetic foot assessment including for fracture, (3) necessary wound debridement, (4) reporting or requesting higher levels of care or emergency care, and related policy failures. ¶¶ 225-232. In other words, policy decisions reflecting **lack** or **absence** of a protocol requiring appropriate action for something so typical as a diabetic foot infection, also forms the basis of *Monell* liability and necessitates denying the motion. *E.g., Crowson*, 983 F.3d at 1185.

Action Staffing seems to dispute whether it had such policies, or a failure of policy and protocols, but any factual dispute about whether Action Staffing's policies were lacking necessitates discovery. *Dias*, 567 F.3d at 1178; *Est. of Hebert*, 2023 WL 4744927, at \*14 ("unavailing and inappropriate" to dispute allegations).[6] At this stage, the Complaint alleges more than the "minimal elaboration" necessary to survive dismissal, so the motion should be denied. *Arakji*, 2015 WL 7755975, at \*6.

## C. Plaintiff Plausibly Pled A Pattern Of Behavior Given Both Defendants Had Multiple Contacts And Acted Pursuant to Policy

Action Staffing's motion should also be denied because, accepting the allegations as true, Plaintiff pled a pattern or practice which supports the inference of an unconstitutional practice or custom. Here two Action Staffing employees, Defendants Nervais and Chery, both had multiple contacts with Mr. Martinez which obviously necessitated emergency care to treat his serious infection and prevent amputation. These multiple contacts with two employees—and the seriousness of his extremely alarming symptoms—show that Defendants' failures reflect a practice and custom of Action Staffing. ¶¶ 111-124, 152-171, 186-190.

The case of *Tapia v. NaphCare Inc.*, is instructive in supporting denial of the motion. No. C22-1141-KKE, 2025 WL 306387, at \*7 (W.D. Wash. Jan. 27, 2025). In

---

[6] *Hogan v. OK Dep't of Corr.*, 24 F. App'x 984, 985 (10th Cir. 2002) (unreported) ("Factual disputes between the parties cannot be resolved in a motion to dismiss."); *Young v. Brock*, No. 10- CV-01513-WJM-CBS, 2011 WL 7163067, at \*6 (D. Colo. Aug. 15, 2011) ("I am loath to address [] factual disputes . . . without the benefit of discovery.").

that case, while plaintiff did not show prior instances of misconduct with other patients, the court held that Mr. Tapia had demonstrated a pattern or practice to survive summary judgement because of the number of contacts Mr. Tapia had with mental health staff over the course of several weeks. *Id.* The court held that "a reasonable factfinder could conclude that at least five times, an MHP [mental health professional] observed [Mr.] Tapia's 'altered mental status' and failed to escalate his case to an RN or physician" and that "[Mr.] Tapia's interactions with the MHPs span across four weeks and exhibit sufficient duration, consistency, and frequency to constitute a widespread custom under *Monell.*" *Id.* (citing *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) (finding a pattern based on three instances of maltreatment); *Tabb v. NaphCare*, No. 3:21-cv-05541-LK-TLF, 2024 WL 1905638, at *7 (W.D. Wash. May 1, 2024) (adequately alleged *Monell* policy based on purported denial of immediate medical treatment over eight days)).

Here, Mr. Martinez's case is analogous to *Tapia* and *Henry* and similar caselaw – he saw two Action Staffing staff a total of five time (Defendant Nervais three times and Defendant Chery twice) over the course eleven days where they watched Mr. Martinez's infection get worse and worse and still took no necessary action to adequately treat his infection or get him transferred to care outside of the facility for adequate care. ¶¶ 111-124, 152-171, 186-190; *see also Arredondo v. Reams*, No. 20-CV-1445-WJM-NYW, 2021 WL 6805712, at *7 (D. Colo. Feb. 4, 2021), *report*

24

*and recommendation adopted*, No. 20-CV-1445-WJM-NYW, 2021 WL 6805713 (D.

Colo. Mar. 1, 2021) ("Mr. Arredondo's allegations [where he did not allege similar

harm to others but multiple medical staff involved in failures of care], at the least,

raise a reasonable inference of "multiple harms that occurred to the plaintiff himself,

misconduct that occurred in the open, the involvement of multiple officials in the

misconduct").[7] The number of interactions across two weeks with two different Action

Staffing employees supports the inference of a pattern of behavior showing an

unconstitutional practice or custom.

Moreover, an inference can plausibly be drawn that Action Staffing's policies

and procedures—its practices as employees carried them out—reflect an expectation

of delaying and effectively denying needed care to Mr. Martinez.[8] In *Asten*, the court

---

[7] Action Staffing also cites *Arredondo*, but as reflected by the parenthetical above,
*Arredondo* actually supports denying Action Staffing's motion. Action Staffing's
reliance on *Leonhard v. Correct Care Sols., LLC*, is equally unavailing. In *Leonhard*,
the operative complaint alleged "the CCS Defendants and Jefferson County
Defendants maintained unconstitutional policies" and "CCS Defendants and
Jefferson County Defendants failed to adequately train and supervise" their staff. No.
19-CV-00600-PAB-STV, 2020 WL 1694377, at *8 (D. Colo. Apr. 7, 2020), *as amended*
(Apr. 8, 2020). As described above, Plaintiff here does more than assert "bare"
allegations of unconstitutional policies and training, ¶¶ 225-232, and does more than
required at this stage to adequately allege specific unconstitutional policies/training.
[8] Drawing inferences in Plaintiff's favor, discovery may reveal financial incentives
played into this denial of care, but such detail need not be alleged at the pleading
stage. *See Ramos v. Lamm,* 639 F.2d 559, 574 n.19 (10th Cir. 1980*)* ("The lack of
funding is no excuse for depriving inmates of their constitutional rights."). Indeed,
lack of staffing, capacity, or funding is a prototypical illegitimate excuse for a
deprivation. *See, Cal. Coal. for Women Pris. v. United States*, 723 F. Supp. 3d 712,
742 (N.D. Cal. 2024) (wait times, "lack of staffing" deliberate indifference); *Parkell v.
Danberg*, 833 F.3d 313, 339 (3d Cir. 2016) ("Systemic logistical constraints such as

ruled allegations "[t]aken as a whole" stated a claim that Boulder police were expected to use excessive force as a failure of policy. *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1210 (D. Colo. 2009). Importantly, although plaintiff did not allege prior similar incidents, the court allowed the *Monell* claim to enter discovery. *Id.*; *Stanton*, 2018 WL 3473969, at *6 (M.D. Tenn. July 17, 2018) (finding allegations of "delay in sending Plaintiff to a hospital or specialist was pursuant to a [company] policy" denying dismissal of claim against medical contracting company).

Here, similar to *Asten*, Plaintiff alleges Action Staffing "knew" its staff would fail to provide constitutionally adequate care (strongly supported by the multiple defendants and contacts with Mr. Martinez) in deliberate indifference of the serious harms that would occur. ¶ 252. The multiple staff involved, and multiple contacts by each, further supports the allegations, showing a plausible inference of a pattern or practice. *Tapia,* 2025 WL 306387, at *7; *Arredondo,* 2021 WL 6805712, at *7. At this stage, Plaintiffs have provided the "minimal elaboration" necessary to overcome dismissal so the motion should be denied. *Arakji*, 2015 WL 7755975, at *6.

### D. Action Staffing's Policy Of Inadequate Training

Plaintiff also pled failure to train in several ways, which Action Staffing once again ignores and improperly disputes, supporting denial of the motion. First, this is not a single-incident case given the multiple staff and five total contacts with Mr.

---

understaffing, which are unrelated to medical judgment, will typically not excuse failure to provide adequate medical care.").

Martinez. As a result, failure to train is plausible because the two Individual Action Staffing Defendants, Nervais and Chery, acted in accordance with their Action Staffing training and were not disciplined, showing their conduct is consistent with Action Staffing's lacking, inadequate training. ¶ 252. *Moore v. Miller*, No. 10-CV-00651-JLK, 2014 WL 2207346, at *8 (D. Colo. May 28, 2014) (D. Colo. May 28, 2014) (where officers acted "in accordance with their training", "reasonable inference" different training would not have caused violation); *McGill v. Corr. Healthcare Companies, Inc.*, No. 13-CV-01080-RBJ-BNB, 2014 WL 5423271, at *7 (D. Colo. Oct. 24, 2014) (unpublished) (denying summary judgment given disputed facts regarding "inadequate training").

Second, even if considered a "single-incident" case, failure to train is alleged under Tenth Circuit precedent. This theory requires factual allegations sufficient to infer (1) "the existence of a [municipal] policy or custom involving deficient training"; (2) an injury caused by the policy that is "obvious" and "closely related"; and (3) that the municipality adopted the "policy or custom with deliberate indifference" to the injury. *Valdez v. Macdonald*, 66 F.4th 796, 812, 816-17 (10th Cir. 2023). The third element triggers a three-part test for deliberate indifference: (i) the municipality's policymakers "know to a moral certainty that their employees will confront a given situation"; (ii) the situation "presents the employee with a difficult choice of the sort that training or supervision will make less difficult"; and (iii) "[t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights." *Id.*

Accepting the allegations as true and drawing inferences in Plaintiff's favor, facts supporting each element above are plausibly alleged, so the motion should be denied: particular deficient training is thoroughly pled, ¶¶ 225-232; injury resulting that is "obvious" is thoroughly pled, *e.g.,* ¶¶ 7, 50, 56, 120, 123-124, 156, 168, 171, 187-190, 225-227, 241, 243, 252; deliberate indifference is pled, including allegations that Action Staffing "knew" that their failed policies, customs, procedures, decision-making, and training posed an excessive risk of harm to people in custody like Mr. Martinez, and would lead to predictably and obvious unconstitutional results. ¶¶ 224, 251-253; *see Valdez,* 66 F.4th at 812, 816-17.

Like the Tenth Circuit affirmed in *Valdez*, here it is the **lack of training** which can form the basis of *Monell* liability. *Valdez*, 66 F.4th at 816 (lack of training factually disputed at trial); *see also Lance v. Morris*, 985 F.3d 787, 821 (10th Cir. 2021) (lack of training of jail guards on how to determine immediacy of medical complaints). Plaintiff alleges a lack of training on obviously needed topics: to call for an ambulance or arrange other emergency care or hospitalization for patients like Mr. Martinez where an internal provider is unable or unwilling to provide obviously needed emergency medical care; to appropriately assessing diabetic foot conditions; to appropriately debride infections; to appropriately report symptoms to a higher level of care; and to appropriately instruct patients with diabetic foot fractures and diabetic foot ulcers not to bear any weight on the affected foot. *E.g.,* ¶¶ 227-231.

28

As in *Valdez* and *Lance*, it is a factual dispute whether such lack of training caused the constitutional violation, so dismissal is inappropriate. *E.g., Lance*, 985 F.3d at 802 (staff "lacked training" how to make difficult decision whether to contact a nurse); *see also Est. of Burnett v. City of Colorado Springs*, 763 F. Supp. 3d 1281, 1294 (D. Colo. 2025) (denying summary judgment in part on failure to train, including lack of training on responses to medical distress); *see Est. of Ceballos v. Husk*, 919 F.3d 1204, 1220 (10th Cir. 2019) (failure to train theory based on lack of training on a particular situation likely to confront officers).

Ultimately, it is "patently obvious" that in a prison medical setting, there will be patients who present with infections and diabetic foot conditions, and staff must be trained how to identify and properly assess and treat infections and diabetic foot conditions with timely and proper care, including to refer care outside the prison walls when medically necessary. *Connick v. Thompson*, 563 U.S. 51, 64 (2011). It is beyond debate—and Action Staffing does not dispute—that infections and diabetic foot conditions will inevitably arise for patients in the prison setting. Nor can Action Staffing dispute allegations that both Defendants Nervais and Chery acted in accordance with their failed lack of training in failing to timely or properly ensure proper emergency/specialist medical care was provided to a man in need.

Viewing the allegations favorably to Plaintiff, the Complaint plausibly alleges an unconstitutional failure to train and meets every element of that test, so the motion should be denied. *Valdez*, 66 F.4th at 816; *Kerns v. Sw. Colorado Mental*

29

*Health Ctr., Inc.*, No. 18-CV-2962-WJM-SKC, 2019 WL 6893022, at \*12 (D. Colo. Dec. 18, 2019) (holding that, in the context of a motion to dismiss, plaintiff need not plead the failure to train with additional specificity due to the asymmetry of information).

## CONCLUSION

The Court should deny the Action Staffing Defendants' motions to dismiss.

DATED: February 13, 2026

Respectfully submitted,

 *s/ Stephanie M. Frisinger*

David G. Maxted
Stephanie M. Frisinger
MAXTED LAW LLC
1543 Champa Street Suite 400
Denver, CO 80202
dave@maxtedlaw.com
stephanie@maxtedlaw.com
303-353-1535

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2026, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Stephanie M. Frisinger*
Stephanie M. Frisinger

30

## AI CERTIFICATION

*AI Certification.* No portion of the filing was drafted by AI.

*s/ Stephanie M. Frisinger*
Stephanie M. Frisinger
